

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| MICHAEL J. HOLMES, | § | No. 08-16-00150-CR |
| Appellant, | § | Appeal from |
| v. | § | Criminal District Court No. 2 |
| THE STATE OF TEXAS, | § | of Tarrant County, Texas |
| Appellee. | § | (TC # 1395500D) |
| | § | |

## **O P I N I O N**

The State indicted Michael J. Holmes for possession of more than one but less than four

grams of methamphetamine with intent to deliver. After a jury returned a guilty verdict, the trial

judge sentenced him to ten years' confinement. On appeal, he challenges (1) the trial court's denial

of a motion to suppress, (2) references before the jury that he told the police they did not have

permission to search his vehicle, (3) the denial of a jury instruction, and (4) the imposition of

certain court costs. For the reasons that follow, we affirm.

## **MOTION TO SUPPRESS**

A specialized narcotics unit arrested Appellant after they discovered methamphetamine in

his vehicle following an alert by a drug-sniffing dog. He filed a pretrial motion to suppress any

evidence collected in the search of his vehicle. The motion alleged that the police lacked a warrant,

probable cause, or reasonable suspicion to detain him. The circumstances surrounding the search

are at the core of this case. Testimony from the motion to suppress hearing sharply conflicted. We recount the State's version first.

### The State's Claim

On the evening of December 9, 2014, Officers Michael Putnam and Cole Dickerson were working with the "Zero Tolerance" unit of the Fort Worth Police Department.[1] The unit patrols "high crime" areas, defined to mean those with a high incidence of assaults, robberies, burglaries, and narcotics activity. One such area is a strip center that contained the "Vapor City" game room. The game room had several slot machines and was the subject of a separate investigation (and sometime subsequent to the arrest here, the City shut it down). A liquor store occupied the only other space in the strip center and was adjacent to the game room. The police had noticed "a lot" of narcotics violations in the strip center parking lot, as well as stolen vehicles, and persons with felony warrants. At the suppression hearing, the State admitted into evidence crime reports generally supporting its characterization of the strip center as a high crime area.

Officers Putnam and Dickerson arrived at the parking lot around ten o'clock that night in an unmarked vehicle. Both officers were dressed in black uniforms with the word "police" in yellow lettering on both the front and back of their vests. Putnam recalled that the lot was completely dark. Several cars were parked in front of the game room and a single pickup truck was on the other side of the parking lot, in front of the liquor store. The liquor store was closed at that hour. Officer Putnam was initially suspicious of the vehicle for two reasons: from experience, he knew that drugs were sold at that location from vehicles parked away from the game room's front door, and second, a vehicle parked in front of the closed liquor store might be that of a

---

[1] This case was transferred from our sister court in Fort Worth pursuant to the Texas Supreme Court's docket equalization efforts. *See* TEX.GOV'T CODE ANN. § 73.001 (West 2013). We follow the precedents of that court to the extent they might conflict with our own. *See* TEX.R.APP.P. 41.3.

burglar.[2]

Both officers testified that they parked several spaces away and approached the pickup on foot to make a "consensual encounter" with the driver, later identified as Appellant, who was seated in the pickup's driver's side seat. A female passenger was in the front passenger seat at the time. As they approached the vehicle, Officer Dickerson told Putnam that he saw the female reach down as if she were putting something in between the seats. Officer Putnam tapped on the driver's side window and identified himself as a police officer. Appellant first cracked the door to speak with Putnam. Officer Putnam started the conversation by generally asking questions like "how are you doing," and "what are you doing here" and "what is your name." Officer Putnam did not recall Appellant's exact response, other than it was not a "straightforward answer." Officer Dickerson at the time was separately talking with the female occupant.

At that point, Officer Putnam believed he had a reasonable suspicion to continue his interaction with Appellant based on: (1) his being in a high crime area and location known for narcotics; (2) it was late at night; (3) Appellant parked in front of a closed business; and (4) his passenger's furtive movement as witnessed by Officer Dickerson.

Officer Putnam then asked Appellant to step out of the truck to talk with him, at which point, Appellant exited the truck, immediately closed the door, and told Putnam "I do not consent to any searches." Putnam replied that he had not requested to search the pickup, but asked if there was anything he needed to be aware of. Appellant responded no. The exchange seemed strange to Officer Putnam, not because Appellant refused consent, but because he immediately got out of his vehicle and started talking about consent before the officers ever made a request to search the

---

[2] Both Officers Putnam and Dickerson had been with the Fort Worth Police Department over seven years at the time of this incident.

vehicle.[3]  Appellant's demeanor throughout the exchange was nervous and evasive.

Officer Putnam then called a K-9 unit to the scene.  The unit arrived seventeen minutes later and the dog alerted on the vehicle.  The officers found what later turned out to be 3.722 grams of methamphetamine contained in four plastic bags, all found in a black case in the driver's seat.[4]  They also found a bag containing methamphetamine between the passenger seat and center console.  The police then arrested both Appellant and his female passenger.

### Appellant's Claim

Appellant presented a diametrically opposing version of events.  At the suppression hearing, he testified that the parking lot was completely full at the time, and therefore his vehicle was not alone at one end of the parking lot.  The two officers did not approach him on foot, but rather three vehicles all pulled up behind him.  The unmarked police vehicle actually bumped the rear of his truck.  When Appellant got out of his vehicle to see who had hit him, Officer Putnam approached with his gun drawn.  Appellant testified that the other officer pulled his female passenger out of the pickup, and started going through the vehicle.  It was at that point that Appellant told Putnam they did not have permission to search his vehicle.

Appellant also presented a former employee of the Vapor Room to testify that the parking lot was crowded.  The employee testified that the police vehicles blocked Appellant's truck in, and the undercover vehicle tapped Appellant's bumper.  Other officers were also present when Putnam

---

[3]  As Officer Putnam testified:

> [PROSECUTOR]: Let me ask you this, does a red flag go up to you when you ask a citizen, sir, ma'am, can I search your vehicle and they -- they use their Constitutional right and say, No, sir, you can't? Is that a red flag to you?
> [PUTNAM]: No, ma'am.
> [PROSECUTOR]: Why was this a red flag to you?
> [PUTNAM]: Because I had not asked and he had got out and immediately said I do not consent to search. It just was out of the ordinary.

[4]  Additionally, they found body armor that was the subject of a separate indictment not at issue here.

4

and Dickerson first approached Appellant.  The employee did not actually witness all these events firsthand, but reviewed security camera video of the parking lot.  The normal operation of the security system, however, had recorded over the night in question by the time of the hearing and no video was available.

None of the officers wore bodycams or audio recorders.  Either the police vehicles did not have dash-cam units, or the units were not activated.

### The Ruling

The trial court denied the motion to suppress.  The court analyzed the issue in two parts: (1) were the officers justified at the inception in making an investigatory stop; and (2) were their subsequent actions reasonably related in scope to the circumstances that justified the stop.  The court first found the officers had a reason to patrol the strip center, based on the duties assigned to their task force, and the high crime in the area.  Once at the location, the trial court explained its rationale for upholding the detention:

> Now, when [the officers] spotted Mr. Holmes' vehicle there, and they approached the vehicle, they noticed that Mr. Holmes was acting nervously, suspicious.  He gets out of the vehicle, he tells them I'm not going to allow you to look at the -- and go inside my vehicle.  Or my person for that matter.  And without them even requesting that.

> Now, the question of whether or not he was blocked in and whether or not how many officers was there, Mr. Hawkins testified that he saw at least three cars, one on each side and one in the back.  Mr. Holmes testified that he was bumped but it didn't leave any marks on his vehicle.  But he didn't say he was blocked in.

> The reasonable suspicion because of the high crime area and because the way the Defendant asked -- his answers to the questions that were made, made the officers suspicious of criminal activity, they requested that a K-9 unit appear.  Testimony is that a K-9 unit did appear within 17 minutes of the stop, which is not an unreasonable amount of time.  And after the dog alerted, they actually went in and found these drugs in the vehicle, wherein Mr. Holmes was arrested.  His passenger, Melissa Sherman, was also arrested and charged with these offenses.

> Based upon this, the Court believes that both parts of what I need to look at in order to make a determination about this motion has been satisfied.  Officer was justified at the inception, and then his subsequent actions were reasonably related in scope

5

to circumstances that justified that stop. So based upon that the Court's finding is that these were good reasons for the officers to be there to make the stop, to make the arrest, and as such I'm going to deny the Motion to Suppress. That's going to be the order [of] the Court.

Both Appellant and the State treat the above quoted statement from the bench as the trial court's findings of fact and conclusion of law. Appellant's first issue claims the trial court erred in failing to grant the motion to suppress.

## Standard of Review

We review a trial court's ruling on a motion to suppress for an abuse of discretion. *Crain v. State*, 315 S.W.3d 43, 48 (Tex.Crim.App. 2010). That discretion is tested under a bifurcated standard of review as articulated in *Guzman v. State*, 955 S.W.2d 85 (Tex.Crim.App. 1997). *See Amador v. State*, 221 S.W.3d 666, 673 (Tex.Crim.App. 2007); *Krug v. State*, 86 S.W.3d 764, 765 (Tex.App.--El Paso 2002, pet. ref'd). Under that bifurcated standard, we give almost total deference to the trial court's resolution of questions of historical fact, especially when those determinations are based on assessments of credibility and demeanor. *Arguellez v. State*, 409 S.W.3d 657, 662 (Tex.Crim.App. 2013); *Derichsweiler v. State*, 348 S.W.3d 906, 913 (Tex.Crim.App. 2011). Likewise, we give the same deference to trial court rulings that apply the law to the facts if those determinations turn on credibility or demeanor. *Arguellez*, 409 S.W.3d at 662. We review *de novo* mixed questions of law and fact that do not turn on credibility and demeanor. *Id*. We also review *de novo* whether the totality of the circumstances are sufficient to support an officer's reasonable suspicion of criminal activity. *Id.* at 663; *Kothe v. State*, 152 S.W.3d 54, 62 (Tex.Crim.App. 2004).

When the trial court makes explicit fact-findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact-findings. *State v. Kelly*, 204 S.W.3d 808, 818-19 (Tex.Crim.App. 2006). Regardless of whether the motion to suppress was granted or denied, the prevailing party is entitled to "the strongest legitimate view

6

of the evidence and all reasonable inferences that may be drawn from that evidence." *State v. García-Cantu*, 253 S.W.3d 236, 241 (Tex.Crim.App. 2008). An appellate court may uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex.Crim.App. 2007).

## Applicable Law

There are three distinct categories of interactions between police officers and citizens: (1) consensual encounters, (2) investigative detentions, and (3) arrests. *Wade v. State*, 422 S.W.3d 661, 667 (Tex.Crim.App. 2013). The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV; *Wiede v. State*, 214 S.W.3d 17, 24 (Tex.Crim.App. 2007). Because the first category of interactions--a consensual encounter--does not constitute a seizure, it does not implicate the Fourth Amendment. *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 2385, 115 L.Ed.2d 389 (1991). The police are as free as anyone to approach a person and ask for information or cooperation. *Florida v. Royer*, 460 U.S. 491, 497-98, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983). But as with any consensual encounter between free citizens, the citizen is perfectly free to walk away. *Id*. at 498, 103 S.Ct. at 1324 (highlighting that in consensual encounters, individuals "may decline to listen to the questions at all and may go on [their] way"); *Crain*, 315 S.W.3d at 49. Despite any inconvenience or embarrassment caused by these encounters, there is no official coercion. *García-Cantu*, 253 S.W.3d at 243.[5]

---

[5] As the Court colorfully explained in *García-Cantu*:

> Police officers may be as aggressive as the pushy Fuller-brush man at the front door, the insistent panhandler on the street, or the grimacing street-corner car-window squeegee man. All of these social interactions may involve embarrassment and inconvenience, but they do not involve official coercion. It is only when the police officer engages in conduct which a reasonable man would view as threatening or offensive even if performed by another private citizen, does such an encounter become a seizure. It is the display of official authority and the implication that this authority cannot be ignored, avoided, or terminated, that results in a Fourth Amendment seizure. At bottom, the issue is whether the surroundings and the words or actions of the officer and his associates communicate the message of 'We Who Must Be Obeyed.'

When the person is not free to walk away, however, the police have elevated the stop to either a temporary investigative detention, or arrest, which are seizures for Fourth Amendment purposes. *Crain*, 315 S.W.3d at 49. An encounter is no longer consensual when an officer, through physical force or a show of authority, restrains a person's liberty. *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980); *State v. Castleberry*, 332 S.W.3d 460, 466-67 (Tex.Crim.App. 2011). We review *de novo* the question of whether a consensual encounter has advanced into a detention. *Id.* at 468. In making that assessment, there are no bright-line rules. *Id.* at 467. Rather, we must examine the totality of the circumstances to determine whether a reasonable person would have felt free to ignore the officer's request or to terminate the consensual encounter. *Id.; Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870 at 1877 ("a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."). The test to determine whether a person has been detained is objective and does not rely on the subjective belief of the detainee or the police. *Castleberry,* 332 S.W.3d at 468.

For an investigatory detention, the detaining officer must have a reasonable suspicion that the person is, has been, or is about to be engaged in criminal activity. *Florida v. Rodriguez*, 469 U.S. 1, 5, 105 S.Ct. 308, 310, 83 L.Ed.2d 165 (1984); *Castleberry*, 332 S.W.3d at 466. Reasonable suspicion of criminal activity permits a temporary seizure for questioning that is limited to the reason for the seizure. *Wade*, 422 S.W.3d at 668, *citing United States v. Brignoni-Ponce*, 422 U.S. 873, 881-82, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Reasonable suspicion is a "less demanding standard than probable cause" and is "considerably less than preponderance of the evidence," yet

253 S.W.3d at 243 [footnotes and internal quotes omitted].

the Fourth Amendment demands "at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 675-76, 145 L.Ed.2d 570 (2000). The reasonable suspicion test also employs an objective standard that disregards the subjective intent of the officer, and looks to the totality of the circumstances, "including the cumulative information known to cooperating officers at the time of the detention." *Furr v. State*, 499 S.W.3d 872, 877–78 (Tex.Crim.App. 2016).

### Application

Appellant urges two primary reasons why the trial court erred in failing to grant the suppression motion. First, assuming a consensual encounter transitioned into an investigatory detention at the point when the officers requested a K-9 unit, Appellant argues the trial court erred in finding any reasonable suspicion at that point in time. The argument follows this line of attack: (1) the facts known to the officers (high crime area, evening hours, location of the vehicle, generalized impressions of evasive answers) do not individually, or collectively, justify the detention; (2) the remaining justification--Appellant's assertion of his 4th Amendment right-- cannot as a matter of law be considered as a part of the reasonable suspicion formula. Accordingly, the police lacked a reasonable suspicion to detain Appellant in an investigatory detention after he exited the vehicle and denied permission to search. Appellant's second line of attack urges that the actual detention began when he and his companion were "ordered" out of the pickup, and thus Appellant's assertion of Fourth Amendment rights could not be considered in any event. For much the same reason, the facts then known by the officers would not support any reasonable suspicion to convert a consensual encounter into an investigatory detention.

We take the second argument first. At the outset, the record does not support Appellant's claim that he was "ordered" out of the truck. Officer Putnam specifically denied that Appellant was ordered out of the car. Putnam testified at the hearing: "I asked him to step out of the truck

9

to speak with me." At trial he testified that he asked Appellant "if he didn't mind stepping out and talking to [him]." Appellant's testimony does not help in this regard. He claims he exited the truck *before* even speaking to an officer. His version of events was so diametrically opposed to the officers that the trial court had to make a credibility assessment. The court apparently believed the officers, and we cannot say their testimony shows they ordered him out of the truck.

Appellant also relies on Officer Dickerson's use of a tactical flashlight and his description of having "removed" the female passenger from the vehicle. Dickerson actually testified that he did not remember having his flashlight that night, though he usually does. There is no description of how the light was used, or whether Appellant even saw it, thus the situation here is different from when the police use their vehicle's emergency lights or spotlight as a show of authority. *Cf. Crain*, 315 S.W.3d at 52 (use of spotlight directed onto pedestrian coupled with a request to come over here that sounded like an order); *García-Cantu*, 253 S.W.3d at 243 (use of spotlight, authoritative tone officer used, and boxing in defendant who was in a vehicle, were all part the totality of circumstances indicating a reasonable person would not think they are free to go); *Hudson v. State*, 247 S.W.3d 780, 785 (Tex.App.--Amarillo 2008, no pet.)(activating overhead lights and calling out to pedestrian). Officer Dickerson's use of the word "removed" is ambiguous at best, and could imply some use of force, or simply describe the result of a polite request.

The balance of Appellant's argument contends that the other facts known to the officers (high crime area, evening hours, location of the vehicle, evasive answers) do not individually, or collectively justify the search, and that the State must therefore rely on Appellant's assertion of his Fourth Amendment rights as a basis for the detention. Appellant then contends the mere denial of consent to search can never be considered a valid basis to conduct a search. *See United States v. Santos*, 403 F.3d 1120, 1125-26 (10th Cir. 2005)("If refusal of consent were a basis for reasonable suspicion, nothing would be left of Fourth Amendment protections. A motorist who consented to

10

a search could be searched; and a motorist who refused consent could be searched, as well."); *United States v. Machuca-Barrera*, 261 F.3d 425, 435 n.32 (5th Cir. 2001)("The mere fact that a person refuses to consent to search cannot be used as evidence in support of reasonable suspicion.").

The argument misses the mark in two respects. First, in Appellant's actual discussion of the facts known by the officers, he addresses them individually, and not collectively. The State expressly disavows that any one fact by itself justifies the search, and we agree. Instead, the State claims the facts, even omitting the invocation of a Fourth Amendment right, collectively support the investigative detention. Second, of the facts that Appellant individually assails, he overlooks the furtive movement by the passenger as witnessed by Officer Dickenson before they even got to the pickup.

Collectively, the following facts provide at least enough reasonable suspicion for the officers to have briefly detained Appellant until a K-9 dog cleared the vehicle:

1. Appellant parked his truck in a high crime area, where there was a higher incidence of drug transactions, stolen vehicles, and persons with felony warrants.

2. Appellant parked his vehicle away from the only open business.

3. Officer Putnam was aware that drugs were sold out of vehicles to patrons of that open business.

4. It was nighttime and the area was unlit.

5. While approaching the occupied vehicle, Appellant's passenger made a movement indicative of hiding something under the seat.

6. When asked what he was doing there, Officer Putnam believed that Appellant's responses were evasive and his tone was nervous (though he could not articulate Appellant's precise response).

Viewed *individually*, these facts alone could not justify a detention. *E.g. Brown v. Texas,* 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979)(standing alone, a person's presence in an area of expected criminal activity is not enough to support a reasonable suspicion the person is

11

committing a crime); *Wade*, 422 S.W.3d at 671 ("Nervousness is not sufficient to establish reasonable suspicion, but nervous or evasive behavior is a relevant factor in determining reasonable suspicion for a *Terry* stop and frisk."); *Klare v. State*, 76 S.W.3d 68, 73-74 (Tex.App.--Houston [14th Dist.] 2002, pet. ref'd)("Time of day is a factor that a court may take into consideration when determining whether an officer's suspicion was reasonable; however, time of day is not suspicious in and of itself."). But viewed *collectively*, the circumstances raise reasonable suspicion that justified at least the seventeen-minute wait for a K-9 unit to confirm or deny the presence of narcotics. *Cf. Amorella v. State*, 554 S.W.2d 700, 702 (Tex.Crim.App. 1977) (reasonable suspicion found where three men were spotted late at night in a car parked in front of a closed business, with the motor running and the trunk of car open, which one occupant closed upon seeing the police); *Crooks v. State*, 821 S.W.2d 666, 669 (Tex.App.--Houston [14th Dist.] 1991, no pet.)(reasonable suspicion found where defendant was sitting in a vehicle in an empty parking lot in area known for drug trafficking and he ducked in driver's seat when officer approached). Because there was sufficient reasonable suspicion raised absent Appellant's statement about searching his vehicle, we need not consider whether that statement was important to the denial of the motion to suppress. We overrule Issue One.

## TRIAL REFERENCES TO REFUSAL TO CONSENT

At trial, Appellant re-urged before the jury his claim that the State was relying on illegally seized evidence. The trial court instructed the jury that no evidence obtained by an officer in violation of the Texas or United States Constitutions "shall be admitted in evidence against the accused . . . ." *See* TEX.CODE CRIM.PROC.ANN. art 38.23(a)(West 2005)(allowing jury to decide issue when raised by the evidence). The jury was further instructed on the law of consensual police encounters versus police detentions. If the jury had a reasonable doubt as to whether the police blocked Appellant in, they were instructed to find Appellant not guilty. Accordingly, the parties

12

elicited much of the same evidence from the suppression hearing before the jury.

In his second issue, Appellant complains about the admission into evidence of his statement that the police did not have consent to search his vehicle, and the prosecutor's reference to that same statement in opening and closing argument. Appellant contends that the Fourth Amendment allows one to refuse to consent to a search, just as the Fifth Amendment allows one to refuse to take the stand in their own defense. Generally, a prosecutor cannot comment on or present evidence of a defendant's invocation of the Fifth Amendment right not to testify. *Griffin v. California*, 380 U.S. 609, 613, 85 S.Ct. 1229, 1232, 14 L.Ed.2d 106 (1965)(prohibiting comments on failure to testify); *Doyle v. Ohio*, 426 U.S. 610, 611, 96 S.Ct. 2240, 2241, 49 L.Ed.2d 91(1976)(prohibiting evidence of post-arrest silence). Appellant urges a similar prohibition should have applied to his *sua sponte* statement to the police that they did not have permission to search his vehicle. In sum, he urges that we apply the Fifth Amendment *Griffin* and *Doyle* holdings to the facts of this Fourth Amendment case.

## The Testimony

Appellant complains about this exchange during Officer Putnam's trial testimony:

[PROSECUTOR]: What happens then?

[PUTNAM]: The Defendant steps out of the vehicle and immediately shuts the door and tells me: I do not consent to any searches.

[PROSECUTOR]: Had there been any question --

[DEFENSE COUNSEL]: I object -- I object to this, Your Honor. I object. A person's assertion of his constitutional right is not -- is not a basis for search or detention.

THE COURT: That's overruled.

[PROSECUTOR]: Had there been any discussion or question from you thus far about searches?

[PUTNAM]: No, ma'am, I had not asked to search anything at that time.

[PROSECUTOR]: Had anyone, the Defendant, the passenger, Officer Dickerson,

13

anyone right there on the scene said anything about searching?

[PUTNAM]: No, ma'am.

[PROSECUTOR]: The Defendant is the first one to bring it up?

[PUTNAM]: Yes, ma'am.

The same testimony came out at other points in the trial. In Appellant's cross-examination of Officer Putnam, we find this exchange:

[DEFENSE COUNSEL]: Okay. What did you say to him when he says I don't -- I'm not going to consent to you searching my car?

[PUTNAM]: I just said, okay, I haven't asked you to search, is there anything I need to be aware of.

[DEFENSE COUNSEL]: And what did he say?

[PUTNAM]: He said no.

The same issue came up again when Appellant called his passenger, Ms. Sherman to testify. She claimed that all the drugs were hers; she was only with Appellant that night because they were old friends. They had just pulled up into the parking lot, intending to go into the game room, when several police vehicles pulled up. On direct examination, she explained:

[SHERMAN]: And then I proceeded to step out of the car and that's when -- when I went to go step out of the car, that's when they started to dig in the vehicle and that's when Mr. Holmes said: I do not consent to search of my vehicle.

[DEFENSE COUNSEL]: Okay. So let me ask you, did he say that in response to them looking through the car?

[SHERMAN]: Yes, yes.

The same substance of the above quoted testimony came out at least four more times during the State's cross-examination of Ms. Sherman. Appellant's counsel objected, but only to the repetitive nature of the questions.

### The State's Opening and Closing Argument

Appellant also complains of this statement in the State's opening:

[PROSECUTOR]: Well, Officer Putnam walked up to the driver's side and started talking with the driver, the Defendant. And he asked him what he was doing there.

14

The Defendant said he was there for the game room, but he appeared to be nervous, so Officer Putnam asked the Defendant to step out of the vehicle. The Defendant steps out, immediately shuts his door and says --

[DEFENSE COUNSEL]: Objection, Your Honor. Pejorative comment on exercise of Constitutional rights. I object.

THE COURT: That's overruled. It's just opening statements, not evidence.

[PROSECUTOR]: And says that he can't search anything without even being asked a question. All of these circumstances and factors go into Officer Putnam calling a K-9 unit out to the scene.

And this exchange in the State's rebuttal closing argument:

[PROSECUTOR]: You get to make reasonable inferences from the evidence, and I get to argue as to what that may be. He's thinking, as he gets out of the truck -- because we know he said door slammed. No, no, you can't search. Can't search here. Can't search here. Door slammed. Door closed.

[DEFENSE COUNSEL]: I object. I object, Your Honor. Counsel is stating that invocation of his constitutional right is evidence of his guilt. Prohibited argument.

THE COURT: That's overruled.

[PROSECUTOR]: So you know that when he immediately got out, he knew something was in that truck. What's the big deal? Oh, no, me and Melissa just riding around just chilling. Yeah, that's my friend. I've known her since she was just knee high to a grasshopper. Yeah, Officer, you want to search? We're just doing some game room business tonight. Come on in. Yeah, let me open the door for you.

[DEFENSE COUNSEL]: I object. This is further argument about his assertion of a constitutional right as being evidence of guilt.

[PROSECUTOR]: Reasonable conclusion of the facts.

[DEFENSE COUNSEL]: It's not a reasonable conclusion --

THE COURT: It's overruled. It's overruled. This is just final argument.

## Standard of Review

We review a trial court's decision to admit or to exclude evidence for an abuse of discretion. *See Martinez v. State*, 327 S.W.3d 727, 736 (Tex.Crim.App. 2010). A trial court also has broad discretion in controlling the scope of opening and closing argument. *Dugan v. State*, 82 Tex.Crim. 422, 199 S.W. 616, 617 (1917)(opening); *Lemos v. State*, 130 S.W.3d 888, 892

15

(Tex.App.--El Paso 2004, no pet.)(closing). Accordingly, we also review a trial court's ruling on an objection asserting improper jury argument for an abuse of discretion. *Whitney v. State*, 396 S.W.3d 696, 705 (Tex.App.--Fort Worth 2013, pet. ref'd). The test for an abuse of discretion is whether the trial court acted arbitrarily or unreasonably, without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex.Crim.App. 1990). A trial court abuses its discretion when its decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Taylor v. State*, 268 S.W.3d 571, 579 (Tex.Crim.App. 2008).

### Preservation of Error

At the outset, the State urges several reasons why Appellant has forfeited the claimed error. We need only address two of those arguments.

Preservation of error under Texas Rule of Appellate Procedure 33 requires that the record show (1) the complaining party made a timely and specific request, objection, or motion; and (2) the trial judge ruled either on the request, objection, or motion, or the court refused to rule and the complaining party objected to that refusal. TEX.R.APP.P. 33.1(a); *Haley v. State*, 173 S.W.3d 510, 516-17 (Tex.Crim.App. 2005). A corollary states that the issue on appeal must mirror the complaint made at trial. *Pena v. State*, 285 S.W.3d 459, 464 (Tex.Crim.App. 2009)("Whether a party's particular complaint is preserved [for review] depends on whether the complaint on appeal comports with the complaint made at trial."). Appellant's argument on appeal is hinged on the precept that a person cannot be penalized for exercising a constitutional right. Appellant advances that concept from the Fifth Amendment cases of *Griffin* and *Doyle*, and persuasively argues they should equally apply to Fourth Amendment protections. Yet we view the objection to Officer Putnam's testimony as raising a relevance concern ("I object -- I object to this, Your Honor. I object. A person's assertion of his constitutional right is not -- is not a basis for search or

16

detention."). And the objection made at the suppression hearing was also a relevance objection, and not the nuanced constitutional argument advanced here.[6]

The Texas Court of Criminal Appeals also requires that "an objection must be timely, specific, pursued to an adverse ruling, and must be made each time inadmissible evidence is offered. *Haley*, 173 S.W.3d at 516-17; *Geuder v. State*, 115 S.W.3d 11, 13 (Tex.Crim.App. 2003); *see also Leday v. State*, 983 S.W.2d 713, 718 (Tex.Crim.App. 1998)(explaining that Texas applies the "futility rule," meaning that despite a trial court's ruling that evidence is admissible, a party must keep making futile objections on pain of waiver). Stated otherwise, evidentiary error is cured when the same evidence is admitted elsewhere without objection. *Id*. at 718; *Gillum v. State*, 888 S.W.2d 281, 285 (Tex.App.--El Paso 1994, pet. ref'd); s*ee also Clay v. State*, 361 S.W.3d 762, 767 (Tex.App.--Fort Worth 2012, no pet.). As we set out above, testimony about Appellant's *sua sponte* statement to the police came in without any objection at several points in the trial. The State urges the admission of the testimony without objection elsewhere cured any error with the one instance where an objection was lodged.

There are two exceptions to the rule requiring an objection be lodged each time the evidence is offered. Counsel may (1) obtain a running objection, or (2) request a hearing outside the presence of the jury. *Martinez v. State*, 98 S.W.3d 189, 193 (Tex.Crim.App. 2003); *Haley*, 173 S.W.3d at 516-17. Appellant did not request a running objection, nor was there a hearing on the admissibility of the particular statement at issue here. The only hearing was on the motion to

---

[6] When the issue came up in the suppression hearing, Appellant objected as follows:

> [STATE'S ATTORNEY]: Had there been any request from you at that point for a search at all?
> [APPELLANT'S COUNSEL]: I object. I object. The fact -- Judge, the fact that someone asserts their Constitutional rights is not a basis for search. And I --
> THE COURT: What was the question?
> [STATE'S ATTORNEY]: Had he, Judge, asked for a search at this point.
> THE COURT: Okay. It's overruled.

suppress.  As a general rule, a motion to suppress will preserve error in the admission of evidence without further objection at trial if the motion is overruled by the court following a pretrial hearing. *Garza v. State,* 126 S.W.3d 79, 84 (Tex.Crim.App. 2004).  Nonetheless, the motion to suppress sought to suppress evidence based on the claimed illegality of the detention and subsequent search. The trial judge was never asked to consider the admissibility of Appellant's *sua spon*te statement based on the argument advanced here.  That is to say, if the argument on appeal complained that the *sua sponte* statement was the fruit of an illegal detention, the ruling on the motion to suppress would have preserved any error without need for the same trial objection.  Yet the argument on appeal is entirely different and the suppression ruling did not operate to preserve an argument never advanced at the suppression hearing.[7]

When error is not preserved, there is nothing for an appellate court to review.  *Ethington v. State*, 819 S.W.2d 854, 858 (Tex.Crim.App. 1991)(error not preserved where defendant fails to object to evidence at trial); *Hudson v. State*, 675 S.W.2d 507, 511 (Tex.Crim.App. 1984); *Leday v. State*, 983 S.W.2d 713, 718 (Tex.Crim.App. 1998)("Our rule, therefore, is that overruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling.  This rule applies whether the other evidence was introduced by the defendant or the State.").  We are constrained to agree with the State that the error presented here is forfeited.

### Application

Even were we incorrect on the forfeiture argument, however, under the unique facts of this case Appellant's argument would still fail.  Existing Texas authority holds that an individual's

---

[7] Another possible exception contemplates that a defendant may himself admit evidence to rebut improperly obtained and admitted evidence when "impelled" to do so. *Leday*, 983 S.W.2d at 718-19.  Appellant has not raised this issue, and indeed did not respond to the State's waiver argument at all on appeal.  We think the exception inapplicable because had Appellant's argument as advanced on appeal been urged below, the trial court could have excluded the "consent" testimony altogether while still admitting the balance of the evidence challenging and upholding the detention.

refusal to consent to a search is not evidence of guilt. This court first reached that conclusion in *Powell v. State*, 660 S.W.2d 842, 845 (Tex.App.--El Paso 1983, no pet.). In that case, the defendant picked up a package from a shipping service. The police immediately confronted her and asked to open the sealed package. We held the defendant's refusal to open the package was not admissible because "[t]he invocation of constitutional rights such as assistance of counsel, silence, or freedom from unreasonable searches may not be relied upon as evidence of guilt. To permit the use of such evidence for purposes of incrimination would erode the protections guaranteed by both state and federal constitutions." *Id.* at 845; *see also Reeves v. State*, 969 S.W.2d 471, 495 (Tex.App.--Waco 1998, pet ref'd)(reaching the same holding for search of a house). The weight of federal and out-of-state authority follows this rule. *U.S. v. Runyan*, 290 F.3d 223, 249 (5th Cir. 2002)(collecting cases and stating "the circuit courts that have directly addressed this question have unanimously held that a defendant's refusal to consent to a warrantless search may not be presented as evidence of guilt."); Kenneth J. Melilli, *The Consequences of Refusing Consent to A Search or Seizure: The Unfortunate Constitutionalization of an Evidentiary Issue*, 75 S.Cal.L.Rev. 901, 903-04 (2002)(collecting cases).

The facts of this case, however, raise an important distinction. The officers never asked to search the vehicle and the denial of consent was an unsolicited comment from Appellant. The San Antonio Court of Appeals distinguished the *Powell* line of cases when the statement was not in response to any police request for permission to search. *Bishop v. State*, 308 S.W.3d 14, 17-18 (Tex.App.--San Antonio 2009, pet ref'd). In *Bishop*, the police effected a traffic stop and placed the defendant under arrest for an outstanding warrant. They placed him in the back of a police squad car and began searching the defendant's vehicle based on the search-incident-to-arrest exception under the Fourth Amendment. *See Arizona v. Gant*, 556 U.S. 332, 335, 129 S.Ct. 1710, 1714, 173 L.Ed.2d 485 (2009)(defining scope of exception). As they began their search of the car,

19

the defendant "started yelling loudly from inside the patrol car that they did not have permission to search the vehicle and it was an illegal search." 308 S.W.3d at 16. The statement was introduced at trial, and on appeal, he claimed it was an improper comment on his invocation of the Fourth Amendment.

The court rejected the argument because the defendant's "statements were not an invocation of his Fourth Amendment right to decline permission for a search" but were "made spontaneously, in the excitement of the moment, and were not the result of questioning; therefore, they were admissible as 'res gestae' statements." *Id*. at 17-18; *see also McCauley v. State*, 05-15-00629-CR, 2016 WL 3595478, at *2 (Tex.App.--Dallas June 28, 2016, pet. ref'd)(mem. op., not designated for publication)(holding that "because the Fourth Amendment did not require police to obtain a warrant to insist on a test of appellant's breath, admission of evidence of appellant's refusal would not violate the Fourth Amendment."); *Davis v. State*, 10-10-00405-CR, 2012 WL 662315, at *3 (Tex.App.--Waco Feb. 29, 2012, pet. ref'd)(mem. op., not designated for publication)(admission into evidence of defendant's statement to officers "not [to] search his room" was not error because search was based on warrant and not a request for consent). The officers here never asked for consent to search, nor was their justification for the search based on consent.

Additionally, the State's use of the *sua sponte* statement was at least partly in response to Appellant's argument that the methamphetamine was not his. The police found two stashes of the drug in the vehicle--one in a black case on the driver's side and one in a baggy between the passenger side seat and center console. Appellant called the passenger as a witness who testified that all the drugs were hers and that Appellant was unaware of the drugs. Appellant presaged this defense in his opening statement. He reiterated the defense in closing argument. The State argued that his *sua sponte* statement showed his knowledge of the drugs in the vehicle.

20

Several federal courts have distinguished the use of a denial-of-consent-statement when it is relevant to rebut a defensive issue. *U.S. v. Dozal*, 173 F.3d 787, 794 (10th Cir. 1999) (defendant's refusal to permit the search of a particular room held admissible for the "proper purpose of establishing dominion and control over the premises where a large part of the cocaine was found."); *U.S. v. McNatt*, 931 F.2d 251, 258 (4th Cir. 1991)("Appellant was well aware that if he claimed the cocaine had been planted in his truck by Officer Clarke, the prosecutor would be allowed to comment on his refusal to allow a search at the time most important to this issue."). Because the evidence was germane to rebuttal of a specific defensive issue, the trial court did not err in allowing it.

Moreover, we conclude that the trial court did not abuse its discretion in admitting Appellant's statement over a relevance objection. And once that statement was in evidence (from the several sources we set out above), the trial court did not abuse its discretion in allowing the State to comment on the testimony. Generally, proper jury argument falls into one of four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) an answer to the opposing counsel's argument; or (4) a plea for law enforcement. *Berry v. State*, 233 S.W.3d 847, 859 (Tex.Crim.App. 2007); *Underwood v. State,* 176 S.W.3d 635, 639 (Tex.App.--El Paso 2005, pet. ref'd). In its closing, the State is allowed to comment on evidence admitted during trial. *See Felder v. State*, 848 S.W.2d 85, 96 (Tex.Crim.App. 1992)(accurate summation of evidence admitted at trial was not error); *Quiroz v. State*, 764 S.W.2d 395, 400 (Tex.App.--Fort Worth 1989, pet. ref'd)(no error shown when State's argument was a proper summation of and reasonable deduction from the evidence). In its opening statement, the State has the statutory right to tell the jury the nature of the accusations against the defendant and the facts that are expected to be proven. TEX.CODE CRIM.PROC.ANN. art. 36.01(a)(3)(West 2007); *Taylor v. State,* 947 S.W.2d 698, 706

(Tex.App.--Fort Worth 1997, pet. ref'd). Because the trial court did not abuse its discretion in admitting the evidence, or allowing comments on what was in evidence, we overrule Issue Two.

## REFUSAL OF CHARGE INSTRUCTION

In his third issue, Appellant complains of the trial court's refusal to include this statement in the court's charge: "[Y]ou are instructed that a person's assertion of a constitutional right may never be considered by you as evidence of his guilt." The trial court denied the requested instruction.

### Standard of Review

The trial court shall deliver a "written charge distinctly setting forth the law applicable to the case" to the jury. TEX.CODE CRIM.PROC.ANN . art. 36.14 (West 2007). We review charge error under a two-pronged test. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1984). First, we must determine whether error exists; second, if error exists, we then must evaluate the harm caused by the error. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex.Crim.App. 2005). The degree of harm required for reversal depends on whether the error was preserved at trial. *Almanza*, 686 S.W.2d at 171; *Neal v. State*, 256 S.W.3d 264, 278 (Tex.Crim.App. 2008). If the error was preserved, we review for "some harm." *Almanza*, 686 S.W.2d at 171. We must reverse "if the error is calculated to injure the rights of defendant, which means no more than that there must be some harm to the accused from the error." *Almanza,* 686 S.W.2d at 171 (internal quotes omitted). In other words, a properly preserved error will require reversal as long as the error is not harmless. *Id.* This analysis requires a reviewing court to consider (1) the jury charge as a whole, (2) the arguments of counsel, (3) the entirety of the evidence, and (4) other relevant factors present in the record. *Reeves v. State*, 420 S.W.3d 812, 816 (Tex.Crim.App. 2013); *see also Almanza*, 686 S.W.2d at 171 ("[T]he actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the

22

argument of counsel and any other relevant information revealed by the record of the trial as a whole.").

## Preservation of Error

The State urges that the error is not preserved. No doubt, Appellant asked for the inclusion of the requested charge and the trial court denied that request. Instead, the State's preservation argument turns on the failure to request the same language as a limiting instruction when the trial court admitted the evidence before the jury. The State's forfeiture argument claims that when evidence is admitted without a proper objection, a litigant cannot circle back at the charge conference seeking an instruction to disregard that evidence. *See Pena v. State*, 08-07-00107-CR, 2009 WL 1889009, at *3 (Tex.App.--El Paso June 30, 2009, pet. ref'd)(not designated for publication)(holding that trial court did not err in refusing instruction on invocation of Fifth Amendment right when evidence about that issue was admitted without any request for limiting instruction).

The Court of Criminal Appeals has held that when a party seeks a limiting instruction, the request must be made when the evidence is offered, and not at the end of the trial. *Hammock v. State*, 46 S.W.3d 889, 894 (Tex.Crim.App. 2001). The rule protects the jury who otherwise would process a piece of evidence during the course of the trial, only to be later told to consider it in a completely different light. *Id*.; *see also Scott v. State*, No. 02-14-00183-CR, 2015 WL 3523155, at *5 (Tex.App.--Fort Worth June 4, 2015, pet. ref'd)(mem.op., not designated for publication) (jury charge complaint forfeited because defendant waited until the charge conference to request jury instruction telling jury not to consider detective's statements during interview with defendant).

The limiting instruction case law is appropriate for this case. The State admitted the *sua sponte* statement to rebut Appellant's claim that he was ignorant of the drugs, and they all belonged to his passenger. The proposed instruction informed the jury that the evidence could not be

considered as evidence of guilt or innocence. Had the issue been raised to the trial court when the testimony was elicited, the court might have considered some manner of limiting instruction. But because evidence of Appellant's *sua sponte* statement was admitted multiple times (several times without objection), it came in for all purposes. Therefore, even if the proposed instruction was correct, the charge stage was too late to add a limiting instruction.

## Application

Even were we incorrect on the forfeiture ground, we conclude the trial court did not err in refusing Appellant's requested submission. The statement that "a person's assertion of a constitutional right may never be considered by you as evidence of his guilt" is an overstatement of the law. It may be true in circumstances such as *Powell* and *Reeves*, when the police actually request permission to search. It falters in cases such as *Bishop*, *Dozal*, and *McNatt* when the basis for the search was not based on consent, or the statement was germane to rebut a defensive issue. Because this case involved use of the statement to rebut a defensive issue that Appellant raised, the blanket instruction that Appellant seeks goes too far. Under the facts of this case, the requested instruction would not have been a substantially correct statement of law and trial court did not err in submitting it as worded. We overrule Issue Three.

## CONSOLIDATED COURT COSTS

Appellant was assessed a $133 "consolidated court cost" fee as a part of his judgment of conviction. At the time of his conviction, the state comptroller by statute allocated the proceeds from that fee in varying percentages to fourteen specified accounts. Act of June 17, 2011, 82nd Leg., R.S., ch. 1249, § 12, 2011 TEX.GEN.LAWS 3349, 3353 (formally codified at TEX.LOC.GOV'T CODE ANN. § 133.102(e). In his fourth issue, Appellant contends that three of those designated accounts are not used for criminal justice related functions, and thus the "consolidated court costs" is more akin to a tax used to pay the general obligations of the State. The distinction is an important

24

one.  Under the Separation of Powers Clause of the Texas Constitution, the judiciary is not a taxing entity--the constitution delegates that role to the other branches of government.  *See Peraza v. State*, 467 S.W.3d 508, 517-18 (Tex.Crim.App. 2015), *cert. denied*, 136 S.Ct. 1188 (2016)(a fee statute is considered constitutional under separation of powers only if it provides for the allocation of court costs for a legitimate criminal justice purpose); *see* TEX.CONST. art. II, § 1.

Specifically on appeal before this court, Appellant contends that the assessment of "consolidated court costs," which include allocations to accounts for (1) "abused children's counseling," (2) "law enforcement officers standards and education," and (3) "comprehensive rehabilitation" violates the Separation of Powers Clause, rendering the entire statute unconstitutional.  After this case was submitted, the Texas Court of Criminal Appeals agreed with Appellant's argument with regard to the "abused children's counseling" and "comprehensive rehabilitation" accounts.  *Salinas v. State*, 523 S.W.3d 103, 108 (Tex.Crim.App. 2017).  For reasons detailed in that opinion, the proceeds earmarked for those two specific accounts were going into either the State's general revenue fund, or to the Department of Human Services.  While this holding seemingly helps Appellant, two other holdings from the case control our disposition of his issue.

First, the *Salinas* court held that the consolidated court cost statute was severable in the sense that if one of the allocated uses is improper, only the portion of the $133 fee allocated to that use should be deleted from the judgment of conviction.  *Id.* at 110-11.  This holding necessarily precludes the relief that Appellant sought in his prayer to this Court--deleting the entire $133 fee.  More importantly, the Texas Court of Criminal Appeals also directed that its holding have limited retroactivity.  *Id.* at 111-12.  The court limited the holding to the actual party in *Salinas* and "any defendant who has raised the appropriate claim in a petition for discretionary review before the date of this opinion, if that petition is still pending on the date of this opinion and if the claim

25

would otherwise be properly before us on discretionary review." *Id.* Otherwise, the *Salinas* holding applies prospectively to "trials that end after the date the mandate in the present case issues." *Id.* Accordingly, the Texas Court of Criminal Appeals has directed the lower courts not to modify a trial court's judgment by reducing the consolidated fees allocated to the accounts for "abused children's counseling" and "comprehensive rehabilitation." And while Appellant in a letter brief urges this Court to extend the *Salinas* holding to cases pending in an intermediate court of appeals, we are constrained by both the language of the *Salinas* opinion, and Fort Worth Court of Appeals decisions refusing that same invitation. *Horton v. State*, 02-16-00229-CR, 2017 WL 1953333, at *4 (Tex.App.--Fort Worth May 11, 2017, pet. ref'd); *Hawkins v. State*, No. 02-16-00104-CR, 2017 WL 1352097 (Tex.App.--Fort Worth Apr. 13, 2017, pet. filed); *see* TEX.R.APP.P. 41.3 (obligation to follow controlling precedents from transferring court).

We would reject Appellant's argument for another reason. The *Salinas* court noted that if the legislature amended the statute before the mandate in that case issued, "the only cases that will be affected by this opinion will be the few that are now pending in this Court and are appropriate for relief." 523 S.W.3d at 113 n.54. The legislature has indeed amended the statute and deleted the "abused children's counseling" and "comprehensive rehabilitation" provisions. *See* TEX.LOC.GOV'T CODE ANN. § 133.102(e)(amended by Act of Apr. 27, 2017, 85th Leg., R.S., ch. 966, § 1 (effective June 15, 2017)). That amendment went into effect on June 15, 2017, preceding the mandate in *Salinas*, which issued on June 30, 2017. *Id.*; *see also Hurtado v. State*, No. 02-16-00436-CR, 2017 WL 3188434, at *1 (Tex.App.--Fort Worth July 27, 2017, no pet. h.)(mem. op., not designated for publication)(noting same).

Appellant also urges that the collection of court costs allocated to the "law enforcement officers standards and education" account is similarly unconstitutional. *Salinas* did not address this particular account, but the Fort Worth Court of Appeals has, and it rejected this identical

26

argument. *Ingram v. State*, 503 S.W.3d 745, 748 (Tex.App.--Fort Worth 2016, pet. ref'd); *see also Austin v. State*, 06-16-00135-CR, 2017 WL 2265679, at \*2-4 (Tex.App.--Texarkana May 24, 2017, pet. ref'd)(following *Ingram* and rejecting similar claim). In this transfer case, we are bound by that holding and similarly overrule Appellant's claim regarding the "law enforcement officers standards and education" account. *See* TEX.R.APP.P. 41.3.

We sustained Issue Four as to the "abused children's counseling" and "comprehensive rehabilitation" account, but deny the relief sought. Issue Four is overruled. We affirm the judgment.

October 31, 2017

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.

(Do Not Publish)

27